**LOUMAC ENTERPRISES, INC. d/b/a Lou Mac Printing**

v.

**SENTRY INSURANCE COMPANY.**

Civ. A. No. 75–2897.

United States District Court, E. D. Louisiana.

Dec. 21, 1978.

Bradford H. Walker, New Orleans, La., for plaintiff.

P. A. Bienvenu, New Orleans, La., for defendant.

CASSIBRY, District Judge:

## FINDINGS OF FACT

1. On April 22, 1974, Sentry Insurance Co. (Sentry) issued a policy of insurance to plaintiff's business, Lou Mac Printing (Lou Mac), against losses by fire and/or other causes not chargeable to the insured.

2. On the morning of August 28, 1974, a fire occurred at the premises of Lou Mac Printing, 3027 Ridgelake Drive, Metairie, La. Various contents were destroyed or damaged.

3. As the parties have stipulated, the fire was intentionally set.

4. At the time of the fire, Louis Paquet, Jr. was Chairman of the Board of Lou Mac and Melvin Gaudin was its President. Louis Paquet, Jr. owned 40% of the stock, Melvin Gaudin owned 40% and Louis Paquet, Sr. owned 20%.

5. Gaudin was the last person to leave the Lou Mac premises on the night of August 27, 1974.

6. The Lou Mac Printing business was handled primarily by Louis Paquet, Jr. and Melvin Gaudin. Charles Clark, from whom the business was purchased, helped Paquet and Gaudin in their operation. He was not an employee of Lou Mac, but rather performed contract labor. Louis Paquet, Sr. was being taught the printing business by Paquet, Jr., Gaudin, and Clark. He served occasionally as bookkeeper and performed other tasks as necessary. None of the other Lou Mac employees acted in a managerial or administrative capacity.

7. On March 15, 1974, vandalism occurred at the premises of Lou Mac. Various contents were damaged or destroyed. Lou Mac subsequently received $50,000 from the Hartford Insurance Co. under the provisions of an insurance policy covering the Lou Mac premises at the time of the vandalism.

8. Some of the $50,000 received by Lou Mac from the Hartford Insurance Co. was used by Lou Mac to repay past debts rather than to purchase new equipment to replace that damaged in the vandalism.

9. Lou Mac commenced operation under that name in early 1973. During 1973, its first year of operation, the company lost $9,789.00.

10. During the first four months of its 1974 fiscal year, ending June 30, 1974, Lou Mac lost $25,889.01.

11. On July 25, 1974, Paquet, Jr. and Gaudin were each indicted for conspiracy to counterfeit (Count 1) and for possession of counterfeit currency (Count 2). A third person, Ernest Ransome, was also charged with these offenses in the same indictment. *United States v. Paquet,* Crim. 74–354, E.D.La.

12. Paquet, Jr. and Gaudin were arrested on these charges on or about July 25, 1974.

13. Paquet, Jr. remained in custody on these charges through and including August 28, 1974, having failed to post the required bond. Gaudin posted the required bond approximately 2 weeks after his arrest. He returned to work at Lou Mac and continued working there up to and including August 28, 1974.

14. The maximum total prison term Paquet, Jr. and Gaudin each could have received for these alleged crimes was 20 years. 18 U.S.C. §§ 371, 472.

15. On October 4, 1974, Paquet, Jr. and Gaudin pleaded guilty to Count 1 of the indictment, which charged conspiracy to counterfeit. That charge carried a maximum term of imprisonment of 5 years. 18 U.S.C. § 371.

16. Paquet, Jr. and Gaudin admit to committing the following acts:

1. On or about the first week of March, 1974, Gaudin showed counterfeit United States currency in the denominations of ten, twenty and fifty dollar bills to Dorothy Deichmann at the Lou Mac premises.

2. On or about the first week of March, 1974, on the Lou Mac premises, Paquet, Jr. instructed Dorothy Deichmann on the manners and methods of passing counterfeit United States currency and the places to pass counterfeit currency to avoid being apprehended.

3. On or about March 18, 1974, on the Lou Mac premises, Paquet, Jr. gave Craig Shay counterfeit United States currency and asked him to find someone willing to purchase large quantities of it.

4. On or about March 30, 1974, Paquet, Jr. and Gaudin possessed approximately $350,000 in counterfeit United States currency, which was concealed by burying it under Gaudin's residence.

5. On or about April 5, 1974, Paquet, Jr. and Gaudin possessed and packaged on the Lou Mac premises in excess of $52,510 of counterfeit Federal Reserve Notes.

6. On or about April 5, 1974, in the Eastern District of Louisiana, Paquet, Jr. again instructed Dorothy Deichmann on the manners, methods and places to pass counterfeit United States currency and how to mail to him the proceeds of the counterfeit United States currency passed.

17. Louis Paquet, Sr. and other members of his family lent money to Louis Paquet, Jr. toward paying the costs of his criminal defense.

18. On a day between March 22 and March 25, 1974, Joe Deynoodt, an insurance agent for Sentry, visited the Lou Mac premises at 3027 Ridgelake Dr., Metairie, La. While there, he discussed with Paquet, Jr. and Gaudin the possibility of Deynoodt selling Lou Mac a policy of insurance against fire and/or other damage not chargeable to the insured.

19. Deynoodt did in fact sell to Lou Mac the insurance policy at issue in this case.

20. Deynoodt visited the Lou Mac premises on several occasions after the initial meeting between March 22 and 25, 1974. He came into contact with Paquet, Jr. and/or Gaudin on these visits.

21. Joe Deynoodt learned in late August, 1974 of the arrest of Paquet, Jr. and Gaudin.

22. Sentry cancelled its insurance policy covering the Lou Mac premises on September 30, 1974 for reason of nonpayment of premiums.

23. On May 5, 1975, Ronald P. Herman, attorney at law, acting as collection agent for Sentry, wrote to Lou Mac demanding payment of premiums in the amount of $343.69, purportedly covering insurance provided from April 22, 1974 to September 30, 1974.

## CONCLUSIONS OF LAW

### I. Arson

■ The law of Louisiana controls this diversity case. The classic statement of the Louisiana rule concerning an insurer's defense of arson is set out in *Sumrall v.*

*Providence Washington Ins. Co.,* 221 La. 633, 60 So.2d 68, 69 (1952):

Inasmuch as the defense is arson, the burden rested upon the insurer to establish, by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it. It is well settled that the insurer need not prove its case against a plaintiff beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense. Proof, of course, may be and invariably is entirely circumstantial. And, in these instances, a finding for defendant is warranted where the evidence is of such import that it will sustain no other reasonable hypothesis but that the claimant is responsible for the fire.

The *Sumrall* court specified when the burden of production shifts onto the plaintiffs:

. . . motive, plus the incendiary origin of the fire, would, in the absence of believable rebuttal evidence, be sufficient to sustain the affirmative defense pleaded by the insurer. 60 So.2d at 70.

*See also Swindle v. Maryland Casualty Co.,* 251 So.2d 787, 791 (La.App. 1st Cir. 1971) (on rehearing).

In the case at bar, there is no question that the fire was arson. The debate centers upon whether defendant has proved that plaintiff was responsible for it.

I find that the defendant has established that the two principal stockholders of Lou Mac did have a motive for destroying the property. At the time of the fire, Paquet, Jr. and Gaudin were under indictment in federal court. Each faced a possible prison term of considerable duration. Lou Mac had since its inception been a financial liability, and had incurred a very large loss in the first part of 1974. If Paquet, Jr. and Gaudin were to be imprisoned, Lou Mac would surely flounder and probably die, for Louis Paquet, Sr. was incapable of running the business by himself and Charles Clark had no firm commitment to Lou Mac. By destroying Lou Mac, therefore, Paquet, Jr. and Gaudin would be ridding themselves of something that had been and would probably continue to be a burden. *Cf. Picoraro v.*

*Ins. Co. of Pennsylvania,* 175 La. 416, 143 So. 360, 361 (1932). And they would also be able to recover the proceeds of the Sentry policy, which they could ultimately apply toward the costs of their legal defense. It is relevant in this regard that Paquet, Jr. and Gaudin had recently recovered a large sum from an insurance company under a similar policy. *See Swindle v. Maryland Casualty Co.,* 251 So.2d 787, 791 (La.App. 1st Cir. 1971).

In reaching this conclusion, I have weighed the denials of Paquet, Jr. and Gaudin against the circumstantial evidence presented by the defendant, as the *Sumrall* case commands. 60 So.2d at 70. Opposing this conclusion, counsel for plaintiff argues that Lou Mac's financial condition has been misstated. He claims that the $25,889.01 loss in the first part of 1974 is due to expenses incurred as a result of the vandalism which were not defrayed by the $50,000 insurance proceeds Lou Mac received. The accounting statement showing the loss, however, does not indicate that this is so, nor does any evidence support this contention. Indeed, the evidence shows that some of the insurance proceeds from the vandalism were used to pay back old business debts and were not even applied toward expenses incurred as a result of the vandalism. Counsel for plaintiff also contends that if business had been bad, as defendant contends, Paquet, Jr. and Gaudin would have closed down after the vandalism. Their failure to do so, however, cannot negate the indication on the accounting statement that the business was in fact losing money.

Further opposing the conclusion concerning motive, counsel for plaintiff argues that Paquet, Jr. and Gaudin would not have been inclined to destroy Lou Mac, for they would be destroying the source of their salaries. There is no evidence that Paquet, Jr. drew a salary from Lou Mac; indeed, Gaudin testified that Paquet, Jr. did not do so. Moreover, as noted earlier, these two persons faced the possibility of long prison terms. Counsel for plaintiff goes on to claim that if Paquet, Jr. and Gaudin wanted the insurance money for their legal defense, they would not have pleaded guilty, but rather would have dragged out the proceedings, waiting for the money to come through. It should be noted that Paquet, Jr. and Gaudin had other reasons, in addition to the pecuniary one, for destroying Lou Mac. In any event, plaintiff's argument on this point has several defects. First, even if the insurance proceeds could not be of immediate use toward defraying the costs of defense, the money certainly would be important at some later time in this regard. Thus, Paquet, Jr. had to borrow money to pay for his criminal defense; he could use the insurance money to repay these debts. Second, and even more important, the pleas of Paquet, Jr. and Gaudin seem to have been motivated by an entirely different factor: in exchange for each man's plea to Count 1, for which the maximum penalty was 5 years in prison, the government agreed to dismiss Count 2, which carried a maximum penalty of 15 years.

The incendiary nature of the fire and the motive of the plaintiff to cause it having been established by the defendant, the burden shifts to the plaintiff to suggest other reasonable hypotheses. I find that plaintiff has failed to do this. One of the plaintiff's own witnesses, Charles Clark, stated that Lou Mac had no known enemies, and that competition was not so intense in the printing business as to lead competitors to set fire to Lou Mac. The only hypothesis suggested by the plaintiff's evidence was that the FBI and/or the Secret Service set the fire. Paquet, Jr. stated that the FBI and Secret Service had been harassing him. I attach very little weight to this self-serving accusation. First, Paquet, Jr. was not a credible witness. Second, even if the FBI and Secret Service did commit any improper acts with regard to Paquet, Jr., I would need more than his uncorroborated accusation before I could regard as "reasonable" the suggestion that these governmental agencies set fire to his business. *See generally St. Philip v. Lumbermen's Ins. Co. of Philadelphia,* 18 La.App. 331, 137 So. 359 (La.App.Orleans 1931).

## II. Concealment

The insurer's second defense is that the insurance policy was void from its inception because of plaintiff's violation of a clause in the policy, mandated by LSA–R.S. 22:691(F), which reads:

> Concealment, fraud—This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

The insurer claims that Paquet, Jr. and Gaudin illegally concealed the fact of their counterfeiting operation from Joe Deynoodt. Paquet, Jr. and Gaudin first came into contact with Deynoodt around March 22 to 25, and they remained in contact with him during subsequent weeks. At the initial meeting, Paquet, Jr. and Gaudin provided Deynoodt with information relevant to the issuance of insurance for Lou Mac. During the period of Deynoodt's association with Paquet, Jr. and Gaudin, up until April 5, 1974, Paquet, Jr. and Gaudin were involved in a counterfeiting conspiracy. This conspiracy involved illegal acts taking place on the premises of Lou Mac. Deynoodt ultimately procured a policy of insurance for these premises.

To establish its defense, the insurer must prove a concealment of fact that was willful and that related to material facts or circumstances concerning the insurance or the subject thereof. *St. Paul Fire & Marine Ins. Co. v. St. Clair,* 193 So.2d 821 (La.App. 1st Cir. 1967); *Welch v. New York Underwriters Ins. Co.,* 145 So.2d 376 (La.App. 3d Cir. 1962). Paquet, Jr. and Gaudin withheld from Joe Deynoodt factual information concerning their counterfeiting activities. They did not do so through inadvertence. This information was material to the subject of the insurance because it related to activities taking place on the premises to be insured and by the persons whose business was to be insured. It would greatly have affected the insurance company's decision whether or not to issue the policy. It related to the moral character of the persons applying for the insurance. It related to the dangerousness of the activities to which the premises would be exposed. As Joe Deynoodt stated, if he had known of the counterfeiting activities of Paquet, Jr. and Gaudin, he would never have written the policy. Such concealment violates the duty of the insured "to inform the insurer of all facts which might be used in determining whether the insurance policy will be written." *St. Paul Fire & Marine Ins. Co. v. St. Clair, supra,* at 827. *See also Gulf Ins. Co. v. Chandler,* 193 F.Supp. 339, 341 (W.D.La. 1961).

Plaintiff urges that, even if the court should find illegal concealment of information, the insurer should be estopped from asserting this defense because it failed to take action after this information came to its attention. Joe Deynoodt's knowledge of the arrest of Paquet, Jr. and Gaudin is chargeable to the defendant insurance company. *Gitz Sash Factory, Inc. v. Union Ins. Society of Canton, Ltd.,* 160 La. 381, 107 So. 232 (1926). Indeed, Deynoodt testified that he in fact told Sentry about the arrest. Sentry, however, did not notify Lou Mac that it considered the contract void from its inception. Rather, it cancelled the policy on August 30, 1974 because of nonpayment of premium. And Sentry continued to try to collect the unpaid premium. As late as May 8, 1975—over 9 months after the arrest of Paquet and Gaudin, and over 7 months after their conviction—Sentry was trying to collect the unpaid premiums on a policy which it now contends was void from its inception.

Despite the surface appeal of this argument, plaintiff is unable to produce any case directly supporting its position. Two of the cases it cites are inapposite, for the courts there held simply that the defendant insurance companies had failed to make the initial showings of illegal conduct on the part of the plaintiff insureds. *Allen v. Houston Fire & Casualty Ins. Co.,* 243 So.2d 905, 910 (La.App. 3d Cir. 1971); *Lapeyrouse v. Orleans Industrial Life, Health, Accident*

& *Burial Benefit Ins. Co.,* 4 So.2d 569, 571 (La.App.Orleans 1941). In another case cited by plaintiff, a provision in an insurance contract was held to have been waived by the insurer because it had known of the violation of this provision from the time the contract was originally entered into. *Gitz Sash Factory, Inc. v. Union Ins. Society of Canton, Ltd.,* 160 La. 381, 107 So. 232 (1926). In the instant case, the insurer's knowledge came at a much later time.

Certain conduct by the insurer in *Union National Bank of New Orleans v. Manhattan Life Ins. Co. of New York,* 52 La.Ann. 36, 26 So. 800 (1898)—e. g. continued collection of premiums after knowledge of a contractual violation—seems to make that case applicable to the one at bar. However, another part of the court's reason for holding the insurer estopped was that the insurer had known of the violation from the time the policy was originally entered into. Moreover, the plaintiff in that case was not the original insured, but rather an innocent assignee. The court repeatedly stressed that its holding of estoppel was based on the fact that the plaintiff "was not a party to the original act of insurance" and was "unquestionably in good faith and knew nothing of the untrue statement of the insured." 26 So. at 801. Here by contrast, Paquet, Jr. and Gaudin acted in decidedly bad faith, withholding crucial information.

In both the *Gitz Sash Factory* and *Union National Bank* cases, moreover, the court refused to allow an insurance company to void a policy because of violations of specific contractual obligations created by the policy or the application. Indeed, in *Union National Bank* the court noted that the insured had merely breached a provision that "made material a fact that would otherwise be immaterial" and had not committed a serious misrepresentation with any intent to take advantage. In the instant case, by contrast, we are dealing with a legally-imposed duty not to conceal material information that has been flagrantly violated. Estoppel to assert violation of such a duty should not be as easily found.

These numerous differences between the instant case and those cited by the plaintiff show that the instant case does not present nearly as appropriate a situation for estoppel as those cases did. Accordingly, Sentry will not be estopped here.

For the above reasons, there should be judgment in favor of defendant Sentry Insurance Co. The clerk shall prepare judgment accordingly.