Susan Adams VIVIANO, et al.

v.

**TRAVELERS INSURANCE COMPANY, et al.**

Civ. A. No. 80–2072.

United States District Court,
E. D. Louisiana.

June 10, 1981.

John J. Messina, Metairie, La., for plaintiffs.

P. Albert Bienvenu, Jr., New Orleans, La., for defendants.

CHARLES SCHWARTZ, Jr., District Judge.

Plaintiffs Susan Adams Viviano and Billy G. Viviano, operators of Viviano's Grocery in Blond, Louisiana,[1] bring this suit against the Travelers Insurance Company and the Charter Oak Fire Insurance Company for payment of a claim pursuant to a fire insurance policy they held with the defendants.

---

1. A small town in St. Tammany Parish about 50 miles from New Orleans.

The Court, sitting without a jury, heard the evidence on April 2 and 3, 1981, and took the matter under submission pending the submission of post trial memoranda. Having considered the facts as revealed in the record, the arguments of counsel, and the applicable law, the Court now finds as follows. To the extent that any findings of fact may constitute conclusions of law, they are adopted as such; to the extent that any conclusions of law may state findings of fact, they are so adopted.

## FINDINGS OF FACT

On March 16, 1979, the plaintiffs purchased a house, a grocery store with its stock, a "mechanic shop," a "washateria" building, and a swimming pool, all situated upon about four acres of land, for $72,200. They paid the previous owners, Earl B. Hunt and Vernie Jenkins Hunt, a down payment of $7000 and for the balance due executed a mortgage note pursuant to which they agreed to make monthly payments of $672.99. By agreement with the Hunts, the Vivianos had taken effective possession of the property and had begun operating the grocery as "Viviano's Trading Post" on February 1, 1979.

The Vivianos lived in the house[2] and operated the store until January 23, 1980, the date of the fire.[3] In addition to their retail trade, they operated from their home a second business known as B&S Tax and Accounting Service.

The Vivianos had for several months prior to the fire employed Renee Hines, a neighbor, to help them operate the store. Mrs. Hines worked varying lengths of time, from only a couple of hours to eight hours a day, usually around five days a week. Although Mr. Viviano usually opened the store and Mrs. Viviano usually closed it, Mrs. Hines occasionally operated the store by herself and had done so once while the Vivianos had been out of town.

Another local, Clarence ("Monkey") Jenkins, sometimes did odd jobs for the Vivianos. They paid him no fixed salary, but gave him groceries and beer and occasionally a small amount of cash.

The policy upon which the Vivianos now sue became effective on January 15, 1980—nine days before the fire. The policy covered only the store and its contents; it did not insure the house or the other buildings.

The policy which the Vivianos took out was for $80,000, of which $50,000 was attributable to the grocery building and $30,000 was for its contents. Mrs. Viviano testified that she was persuaded to take the "deluxe package." The structure had an appraised value of $14,400 when the Hunts sold the property to the Vivianos less than a year before the fire; real estate appraisal expert Mary Fallon, who also did the earlier appraisal, testified that the building's value, were it intact today, would have increased by no more than six percent (i.e. to $15,264). The unsalvageable contents of the store for which reimbursement is sought are valued in plaintiff's own post-trial memorandum at only slightly over $24,000, which figure is disputed by the defendants.

Billy Viviano testified that his wife had handled all insurance arrangements. He further testified, however, that he knew that they had had a previous fire insurance policy which expired on January 15, 1980, and that Mrs. Viviano consequently was shopping for a new but similar policy. Susan Viviano, in turn, testified that she had purchased a previous insurance policy in July 1979, for which she had paid about $1200 in cash.

The Vivianos were unable to produce a copy of this insurance policy, which Mrs. Viviano stated was kept in a drawer of a desk in the store. Photographs introduced as exhibits, however, show that the desk, although burned on the exterior, remained structurally intact such that papers contained in its drawers would have survived

---

**2.** In which they have continued to reside to the present.

**3.** Since they have reopened and run a grocery on a smaller scale in the washateria building on the property.

the fire.[4] Mrs. Viviano further pointed to an entry in her "Dome Book" of the store's accounts which reflected a cash expenditure for insurance in accordance with her testimony.[5] That entry, however, was unique by virtue of its being in pencil. The Court also noted on the record at trial that the account book appeared to be little worn, indeed almost new, and that there seemed to be few changes of pens used (and those always coming at the end of, rather than within, a given month's records). Mrs. Viviano did testify that she sometimes made an entire month's entries simultaneously, but the Court nonetheless finds the uniformity of ink, handwriting, slant, and so forth, to be extraordinary.

Mrs. Viviano also testified that although she could not remember their previous insurance carrier's exact name, she did distinctly recall that the name "St. Paul" figured in it. The parties stipulated, however, that a representative for each insurance company licensed in Louisiana in 1978, 1979, or 1980 whose name includes "St. Paul" would testify that no such company received or wrote any fire insurance policy in the name of either or both of the Vivianos, Viviano's Trading Post, Viviano's Grocery Store, B&S Accounting and Tax Service, or the Hunts, the previous owners of the property. The Vivianos produced no evidence of the earlier policy save their own testimony.

In light of these very peculiar circumstances, the Court must find that the Vivianos had no insurance on their property prior to taking out the policy which is the subject of this litigation nine days before the fire.

The testimony concerning the circumstances surrounding the fire was confused and indeed confusing. All parties agree that a fire broke out at Viviano's Trading Post on the evening of January 23, 1980, but the accord there substantially ceases.

The Vivianos testified that they left Blond that evening prior to the outbreak of the fire for a long-planned trip to Cherokee,

North Carolina. Because they stayed with relatives there, the cost of the trip was not great. They took their two children, one of whom, Billy, Jr., was in school at the time; the reason given for taking the child out of school was that his teacher had approved of the trip as being educational and as being of some possible help to Billy, who was having trouble with his school work.

The Vivianos gave the set of keys to the store—which they testified were the only ones in existence—to Renee Hines at about 5:00 on the afternoon of January 23. Because the store's front door locked from the inside and its back door (the only other one) was secured by a padlock from the outside, they did not require the keys for closing the store.

According to the testimony of the Vivianos and Monkey Jenkins, Mrs. Viviano was in charge of the store for most of the afternoon of January 23. Mr. Viviano was packing and loading the car in preparation for their trip. Jenkins was also there; he had worked on and washed the Vivianos' car.

Mr. Viviano testified that he closed the store at 6:55 P.M. This testimony was corroborated by Mrs. Viviano and Jenkins. He testified that he realized that he needed gas as he was locking the store but was unable to get any from the pumps located in front of the store, which were a part of the business operation, because those pumps had been turned off. (Mrs. Viviano testified that the reserves were dry and the pumps had consequently been turned off earlier, but that she had thought she had retained a sufficient amount of gasoline for their personal use prior to embarking on their trip.) In order to turn the pumps back on, it was necessary to open a padlocked box located on the exterior of the store building, but it was not possible to do so without the padlock key which was at that time in the possession of Renee Hines.

The Vivianos thought, correctly as it turned out, that Renee Hines would be at

---

4. The Dome Book presumably survived the conflagration which consumed the copy of the policy.

5. The stipulation was made on the basis of statements in the deposition of Randy P. Sparks in the record.

her church, at which a revival meeting was in progress. Accordingly, they sent Monkey Jenkins in his truck to the church, located no more than a half mile from the store, to get the keys. He came back with the keys, but the Vivianos found that they were able to pump less than two dollars' worth of gasoline before the tank ran completely dry. They sent Jenkins back with the keys to Mrs. Hines, but moments later discovered, they testified, that they had failed to turn the pumps off. Mrs. Viviano therefore pursued Jenkins and was able to catch him before he had been able to return the keys to Mrs. Hines at the church. They testified that they then shut off the pumps, sent Jenkins back again with the keys for Mrs. Hines, and began their trip. Mrs. Hines testified that Jenkins picked up the keys from her at around 7:00 or 7:15 and returned them approximately fifteen minutes later.

Unlike the Vivianos' testimony, Jenkins' story failed to mention any pursuit of him by Mrs. Viviano as he attempted the first time to take the keys back to Mrs. Hines at the church. Further, Jenkins testified at trial that the Vivianos had been able to get only a very small amount of gasoline when they did get the pumps on; in deposition, however, he had said that *he* had filled the car up with fifteen or twenty gallons.

The story's web grows more tangled still upon consideration, and attempts at reconciling, the various stories told concerning the fire and its aftermath. Harold Kerry, chief of the volunteer fire brigade which was summoned to the fire (and fulltime Kenner fireman), testified that when he arrived at the scene he found the store's windows and doors intact. It appeared to him at the time, he said, that there was more than a single point of origination of the fire. Once the fire was put out and prior to leaving the scene, Kerry and his men took care to douse the storeroom of the store, where much of the damage was concentrated, along with other areas affected by the fire, so that the whole would be sufficiently wet that there would be no chance of a reoccurrence of fire.

When he entered the building, Kerry said, he found no evidence that there had been any ransacking. His impression at the time, as he testified that he conveyed it in a remark to Jenkins at the scene, was that the local fire marshal should investigate the blaze because it "looked suspicious."

Monkey Jenkins testified that he spent about five minutes stopping at a neighbor's house on his way home after making the final return of keys to Renee Hines. He arrived at his house at around 7:25, he said, and was there until being notified by another neighbor that the store was afire between 8:00 and 8:15. Jenkins stated that he thereupon went to the store and, because the firemen had not arrived, attempted to put out the blaze with a hose.

After the firemen came and extinguished the fire, Jenkins testified, he followed Renee Hines into the store to survey the damage and to endeavor to find several hundred dollars which the Vivianos had secreted in a hiding place, known only to themselves and Mrs. Hines, behind a drawer of the desk (there was no safe). The money was for store change and (primarily) for cash payment of a gasoline shipment expected the next day. However, they failed to find the cash, and Mrs. Hines testified that she found only a zipper bank bag, empty, under the desk. Neither was there money in the cash register (although there was some difficulty in getting it open to ascertain this). Mrs. Hines also testified that she arrived at the store around 9:00, approximately fifteen minutes before the fire brigade, and that she saw a good deal of smoke coming out of the building at that time. She made no reference, however, to Monkey Jenkins's making any attempt to put out the fire with a hose at that time.

More peculiarly still, both Jenkins and Mrs. Hines testified at trial—for the first time, since no mention of any such occurrence had been made in either of their deposition testimony, or in anyone else's— that they had seen a second fire which broke out the next morning (the 24th). Jenkins testified that a woman named Clara alerted him to the fact that the store

was once again on fire at about 10:00 that morning and that he thereupon went to the store and put out the newly broken out fire with a hose connected to a tap halfway between the store and the house. The morning fire, he said, was in the front right corner of the storeroom. Mrs. Hines arrived moments after he did, Jenkins testified, and remained with him until he had succeeded in extinguishing the second fire entirely.

Mrs. Hines, by contrast, testified that she went to the store on the morning after the original fire in order to check on things generally and found that a second blaze had begun. Thereupon, she testified, she alerted Jenkins to the second fire, and he came to put it out. She said that she remained there with him then until he had put the fire out for the most part but left while he was still spraying. The whole story of the second fire, agreed upon only in its larger outline but inconsistent as to detail, came to light for the first time when Mrs. Hines and Jenkins took the stand; no mention of any such event had been made in depositions or in statements made to representatives of the insurance company.

The insurance company, notified of the fire, sent one of its employees, Pamela Davis, to investigate the circumstances and the damage on January 26. Both she and a photographer who accompanied her took pictures of the damage. Among the items in the store, Ms. Davis found a paper bag which contained four empty cans of charcoal lighter fluid. She also found wooden matches spread out in various places.

The Vivianos returned to their home on Sunday evening, January 27, 1981.

George Martinsen, Jr., an expert consultant in matters pertaining to interior fires, stated that he believed the fire to have been intentionally set. He based his opinion upon, among other factors, finding matches laid out in three different places in the store and upon indications that the fire had burned "unusually high" in the area in which it apparently originated (only there did he find a two by four completely burned away; in other areas they were only half or

so burned through). On cross examination Martinsen acknowledged that he had found no traces of splash patterns, which he would normally expect to find in situations in which a fluid such as charcoal starter is used. George A. Hero III, an electrical engineer, testified that the fire was not of electrical origin.

Although Robert Odom, the contractor chosen by the Vivianos to make an assessment of the damages for insurance purposes, testified that he was responsible for the figure they requested in their claim to the insurance company, the Court is unable to attach a great deal of credibility to his testimony. He stated that the only way to restore the store building, which was left standing, was to tear it down and replace it with an entirely new structure. The cost for the erection of such a new edifice—a simple one built of concrete block—he reckoned to be between forty and fifty dollars per square foot.

A second contractor, William Thibodeaux, testified that the building could be restored to its original condition for $23,227.25, and he offered to do so for that amount. He testified that even if it were necessary to tear down the walls and put up an entirely new structure, the cost of such a concrete block building ought to be no more than twenty-one dollars per square foot (including the pouring of a new concrete foundation slab). Thibodeaux's estimate was concurred in by real estate expert Mary Fallon, who stated that she would take twenty dollars per square foot to be a "fair" figure for the reconstruction of a concrete block building.

Although the Vivianos filed an income tax return in 1979 in which they claimed income, the evidence made it apparent that they were not at the time of the fire clearing the monthly profit of nearly two thousand dollars which they claimed when they filed with their insurance carrier. Indeed, the testimony and exhibits made it clear that the Vivianos, while they could not fairly be said to have been on the edge of bankruptcy, were undergoing serious financial difficulties. They frequently drew

checks for which they did not have sufficient funds on deposit, and creditors sometimes sent representatives to the store to collect due bills in cash after prolonged failure to obtain payment by more conventional means. Dennis McDay, a certified public accountant, testified that he had reviewed the Vivianos' records from the period and that in his opinion they were probably "at the end of the line" and that their overall financial condition was "very, very poor."

## CONCLUSIONS OF LAW

Louisiana law controls this diversity action. *Erie R. R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ The defendant argues that the Vivianos' fire insurance policy was void from its inception inasmuch as it was obtained in violation of a clause of the policy, mandated by LSA–RS 22:691(F), which provided that the

entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating therein.

■ In order to establish the policy's voidness with reference to this contractual requirement, the defendant insurer must prove a concealment of fact which was willful and which was material to the facts or circumstances surrounding the insurance or the insured thing. *St. Paul Fire & Marine Insurance Co. v. St. Clair*, 193 So.2d 821 (La.App. 1st Cir. 1967); *Welch v. New York Underwriters Insurance Co.*, 145 So.2d 376 (La.App. 3d Cir. 1962); *Loumac Enterprises v. Sentry Insurance Co.*, 462 F.Supp. 348 (E.D.La.1978). The Court has already found that the Vivianos acted fraudulently by claiming that they had previously been insured at the time they obtained coverage from defendant. Certainly this was material; it is very possible that the company would have been considerably more reluctant to write the insurance had it been apprised of the Vivianos' previous lack thereof. The misrepresentation violated the Vivianos' duty, as written into the insurance contract and mandated by Louisiana statute, to "inform the insurer of all facts which might be used in determining whether the insurance policy will be written." *St. Paul, supra*, 193 So.2d at 827; *Loumac Enterprises, supra*, 462 F.Supp. at 352. The insurance policy was therefore void from its inception, and the insurance company consequently is entitled to reimbursement from the Vivianos in the amount ($22,977.25) which it paid the Hunts as required by the standard mortgage provision of the Vivianos' policy pending final decision as to the viability of that policy.

■ The insurance company would be entitled to such reimbursement even if it were the case that the Vivianos' policy had not been obtained fraudulently and had thus been valid at the time of the fire. An insurance company's refusal to pay a claim on the basis of its assertion that a fire occurred due to arson constitutes an affirmative defense to the claimant's suit for payment. In such situations, the carrier must prove by a preponderance of the evidence that the fire was of incendiary origin—that is, that it was intentional rather than accidental—and, additionally, that the plaintiffs were responsible for it. *Sumrall v. Providence Washington Insurance Co.*, 221 La. 633, 60 So.2d 68 (1952).

■ As is true of the situation before the Court, charges of arson are rarely susceptible of proof by other than circumstantial evidence. There is no evidence that anyone saw either of the Vivianos or any agent of theirs actually start any fire. Recognizing this general truth about arson cases, the Louisiana Supreme Court has provided specifically that proof of arson may be entirely circumstantial and that an insurer is not required to show beyond a preponderance of the evidence that its defense to the claim is a valid one. *Id.* 221 La. 633, 60 So.2d at 69. Intermediate appellate courts have held, on the other hand, that circumstantial proof "must be so convincing that it will

sustain no other reasonable hypothesis but that the plaintiff was responsible for the fire." *Baghramain v. MFA Mutual Insurance Co.*, 315 So.2d 849 (La.App.3d Cir. 1975); *Wallace v. State Farm Fire & Casualty Insurance Co.*, 345 So.2d 1004 (La.App. 2d Cir. 1977); *see Sumrall, supra*, 221 La. 633, 60 So.2d at 69.

It is clear that there is a certain tension between these two articulations of the standard of proof which an insurer asserting the affirmative defense of arson must meet. This Court will adhere to the first of the two. Unlike the second standard, the preponderance of the evidence requirement bears the imprimatur of the ultimate construer of Louisiana law. Further, the "no other reasonable hypothesis" standard appears to have grown out of a misconstruction of the holding of the *Sumrall* case. The Louisiana Supreme Court there found that "a finding for defendant is warranted where the evidence is of such import that it will sustain no other reasonable hypothesis but that the claimant started the fire." *Sumrall*, 221 La. 633, 60 So.2d at 69. The particular facts of that case, the Court determined, would sustain no other reasonable hypothesis, so that judgment for the defendant was in order. There was, however, no holding that that situation *must* obtain before such a defendant may prevail—only that *if* there is no other reasonable hypothesis as to the cause of the fire, *then* the defendant will prevail. This Court's understanding of Louisiana law is further bolstered by the recent holding of the state's Supreme Court in *Rist v. Commercial Union Insurance Co.*, 376 So.2d 113 (1979), which expressly reaffirmed the holding of *Sumrall* that an "insurer need not prove its case beyond a reasonable doubt; it suffices that the evidence preponderate in favor of the defense." *Id.* at 113. The Court went on to state, in light thereof, that "the sole issue presented" was whether the insurer had "established by a clear preponderance of the evidence that the fire in question was of incendiary origin and that Rist [the plaintiff] was responsible for it." *Id.* at 114.

■ It is the conclusion of the Court, in light of the facts as set out above and based upon its observation of the various witnesses at trial, that the fire which is the subject of this litigation was of incendiary origin. Indeed, although we have rejected the standard of proof which would require the defendant insurer to prove that no other reasonable explanation for the fire save that of the plaintiffs' being responsible for it, the Court finds that there is in fact no such reasonable alternative explanation and that the plaintiffs were directly or indirectly (through an agent) responsible for the blaze.

Among the major reasons due to which the Court has been compelled to reach this conclusion are:

1) The Vivianos' failure to produce any documentation to support that they had insurance (as well as the peculiarities that such a document stored in the desk would not have survived the fire and that such a policy would have been paid for in cash prior to nine days before the conflagration).

2) The fact that insurance was taken out only on the store and its contents and that there was apparently no attempt made or concern shown regarding procurement of insurance for the other buildings, including the house, which were actually worth considerably more than the store.

3) The fact that the policy's face value, and the claim made on that basis, was substantially in excess of any actual worth of the store building and its contents.

4) The presence of four empty charcoal starter fluid cans in the store after the fire was put out.

5) The presence of groups of matches placed around the store.

6) The remarkable testimony of Mrs. Hines and Monkey Jenkins, propounded for the first time at trial despite extensive previous discovery and investigation, about an alleged second fire on the morning of January 24, 1980, and the inconsistencies in their testimony when describing this event.

7) The Vivianos' suspiciously fortuitous decision to be on vacation at the time of the fire, which was discovered very shortly after their leaving Blond.

8) The failure of Mrs. Hines to find the cash which had been allegedly left behind for the store's business needs in the aftermath of the fire—especially in light of the facts that the money was to have been hidden behind a drawer in a desk, at which location the fire would not have harmed it, that there was no sign that the store had been forcibly entered prior to the fire, and that the place did not appear, as nearly as it was possible to tell, to have been ransacked when investigated after the fire.

9) The Vivianos' substantial financial difficulties at the time of the fire.

10) The fact that it would have made no particular sense for the Vivianos to have decided that Mrs. Viviano needed to rush after Monkey Jenkins when he went to take back the keys to Mrs. Hines at church in order, as they said, to turn the pumps back off: if the pumps were indeed dry, as testified, no gasoline could have been pumped from them in any event, and Mrs. Hines could have turned them off as she opened the store the next morning.

11) Monkey Jenkins's changing of his testimony, in addition to the manner already described, between the time of his deposition and the time of trial from saying that he was in the store no later than an hour before its closing to saying at trial that he was in the store immediately prior to its closing, thereby giving the opportunity for him to testify that nothing in the store was unusual or amiss at that time.

12) The remarkable uniformity of the Dome Book entries and the generally pristine condition of that ledger.

*Sumrall* further establishes that once the defendant insurance company has sustained its burden of proving that the fire was of incendiary origin and that the claimants had motive for starting the fire—as did the Vivianos, who would have gained many thousand dollars beyond their actual damages had their claim been honored—the burden returns to the plaintiff, who is then obliged to provide evidence to rebut the otherwise sufficiently established affirmative defense of arson. *Sumrall*, 221 La. 633, 60 So.2d at 70; *see Loumas Enterprises,*

*Inc. v. Sentry Insurance Co., supra,* 462 F.Supp. at 350. As the outlined evidence indicates, the plaintiffs here were able to make no such sufficient rebuttal showing. Therefore, the defendants' counterclaim against the plaintiffs for the amount which they paid to the Hunts under the standard mortgage provision of the insurance policy ($22,977.25) to which extent the insurer obtained an assignment and subrogation of the note) would necessarily be granted even had the Court not previously determined that there was in fact no policy in effect at the time of the fire.

Therefore, IT IS ORDERED that the Clerk enter judgment in favor of defendants/counterclaimants and against plaintiffs/defendants in counterclaim ·in the amount of $22,977.25 plus costs.