INDEPENDENT FIRE INSURANCE
COMPANY

v.

Robert W. LEA, Jr., J. Randall Lea, Elizabeth Lemoine Lea and Richard Dennis Guffey d/b/a Dick Guffey Insurance.

J. Randall LEA, Elizabeth Lemoine
Lea and Robert W. Lea

v.

BALBOA LIFE & CASUALTY
INSURANCE COMPANY
(Meritplan).

Civ. A. Nos. 90–4293, 91–1896.

United States District Court,
E.D. Louisiana.

Feb. 6, 1992.

Thomas M. Richard, William Harry Eckert, Hailey, McNamara, Hall, Larmann & Papale, Metairie, La., for plaintiff.

John Robert Martzell, Martzell, Thomas & Bickford, New Orleans, La., and Bruce Arne Cranner, Blue, Williams & Buckley, Metairie, La., for Robert W. Lea, Jr., J. Randall Lea and Elizabeth Lemoine Lea.

Frank Joseph Gremillion, Baton Rouge, La., for Richard Dennis Guffey.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter involving disputed coverage of habitational properties was tried to this Court without a jury on January 6th, 1992.[1] Plaintiff in Civil Action No. 90–4293, Independent Fire Insurance Company ("Independent Fire"), brought this declaratory judgment action pursuant to 28 U.S.C. §§ 2201–02 and 28 U.S.C. § 1332 seeking a declaration that it did not issue a policy or otherwise bind or provide coverage for claims for property damage asserted against it by defendants, Robert W. Lea, Jr., J. Randall Lea and Elizabeth Lemoine Lea (hereinafter sometimes referred to collectively as "the Leas"). Alternatively and in the event this Court found that a contract of insurance on defendants' properties existed, Independent Fire alleged that it should be rescinded on account of material misrepresentations in the application for insurance. Independent Fire further asserted a claim against Richard D. Guffey d/b/a Dick Guffey Insurance ("Guffey") pursuant to Louisiana Civil Code Article

1. The matter entitled, "J. Randall Lea, et al. versus Balboa Life & Casualty Insurance Co." CA 91–1986"A" was consolidated with this the declaratory judgment action "Independent Fire Insurance Company versus Robert W. Lea, et al" CA 90–4293 just prior to trial, there being common issues of fact. However, at the close of evidence the parties moved to sever CA 91–1986, and upon the stipulation of all parties that they would be bound by the factual findings

herein, and that there would be no need to recall the same witnesses in the event that the later filed suit should proceed to trial at some later time. On that same basis, Secor Bank was allowed to file its intervention in matter numbered CA 91–1986"A". The Court then granted aforesaid motion to sever considering the aforesaid stipulations of the parties, which are part of the record herein.

1958.[2] The Leas counterclaimed against Independent Fire seeking a declaration of coverage for said claims and cross-claimed in the alternative against Guffey, for failing as their agent, to secure the requested coverage and failing to advise them of same. The Leas later amended their counterclaim against Independent Fire seeking penalties and attorney's fees for arbitrary and capricious refusal to pay said claims pursuant to L.R.S. 22:658. Thereafter, and by Second Supplemental and Amending Complaint, Independent Fire asserted claims against the Leas for damages and attorney's fees pursuant to Louisiana Civil Code Article 1958.[3]

At the close of evidence, this Court granted Secor Bank leave to intervene in the Leas' suit against Balboa (Meritplan) and severed same. The Court then took the matter of Independent Fire's declaratory judgment action and claims incidental thereto under submission pending receipt of post-trial memoranda of the parties.

Now, after considering the evidence and the post-trial submissions of counsel for all parties, the Court enters the following Findings of Fact and Conclusions of Law. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

## I. FINDINGS OF FACT.

Except as otherwise indicated, the following facts are the subject of joint stipulations of the parties, which "Joint Stipulations" have been transcribed and are filed in the record of this matter.

### A. INDEPENDENT FIRE—NO POLICY.

#### 1. *Acquisition of the East and West Mary Poppins Properties.*

Robert W. Lea, J. Randall Lea and Elizabeth Lemoine Lea acquired four apartment buildings, containing four separate two-story apartments each, and the land on which the buildings were situated, on August 13, 1987 in an act of exchange.[4] The apartment buildings are located at 1169 and 1173 West Mary Poppins Drive and 1168 and 1172 East Mary Poppins Drive in Harvey, Louisiana. Pursuant to the act of exchange, Robert Lea acquired an undivided one-half interest in the property and J. Randall Lea and Elizabeth Lemoine Lea acquired the other half. [Joint Stipulation # 1].

J. Randall Lea and Elizabeth Lemoine Lea did not take an active role in the management of the property since they reside in Springfield, Missouri. Robert Lea, a resident of New Orleans and Pontchatoula, Louisiana managed the apartment buildings with the assistance of his brother, Edward Lea, also a resident of Pontchatoula. Bruce Lemieux was a tenant/manager. [Joint Stipulation # 2].

On October 16, 1987, the Leas executed a

---

**2.** Guffey is the owner of Dick Guffey Insurance, a general insurance agency, and was acting at all pertinent time as intermediary between the Leas and Independent Fire regarding procuring insurance coverage for property the Leas owned.

**3.** The basis of Independent Fire's claims asserted *via* Second Supplemental and Amending Complaint is that at a time when Robert Lea was well aware of all of the facts and circumstances, in particular the obvious material misrepresentations in the application for insurance coverage on his behalf, he persisted in a wholly meritless counterclaim against Independent Fire. By his actions which include submitting yet additional proofs of loss and amending the Leas' counterclaim seeking penalties and attorney's fees against Independent Fire for arbitrary and capricious refusal to pay under a non-exis-

tent policy, Robert Lea essentially adopted the original misrepresentations of his agent, which were admittedly misstatements or misrepresentations material to the risk, and needlessly escalated and compounded the costs of litigation. The gist of Independent Fire's claim in this regard was that Robert Lea was well aware that the trial regarding coverage as to Independent Fire would be an exercise in futility and a no win situation for the Leas, yet forced Independent Fire to spend its human and financial resources to prepare for and put on its case, regardless of the obvious outcome [i.e., no coverage], as well as defend against a specious claim pursuant to L.R.S. 22:658. Independent Fire's claim in this regard sounds more like grist for the F.R.C.P. Rule 11 mill.

**4.** *See,* Act of Exchange dated August 13, 1987 (Plaintiff's Exh. 108).

Collateral Mortgage[5] with the First Financial Bank whereby the Leas borrowed $275,000.00 and the mortgage was secured by the property acquired in the act of exchange. First Financial Bank also obtained a collateral assignment of leases and rents.[6] [Joint Stipulation # 3].

### 2. *Prior Property Coverage and Claims.*

In January of 1988, at the request of Robert Lea, a general insurance agent, Richard Dennis Guffey, d/b/a Dick Guffey Insurance ("Dick Guffey") procured four policies of property and liability insurance, covering each of the apartment buildings, through Republic Insurance Company ("Republic"). The inception date of the original Republic policies was January 21, 1988 and the amount of coverage for each apartment building was $130,000.00. On January 21, 1989, the Republic policies were renewed, and the amount of property coverage per building was increased to $155,000.00.[7] [Joint Stipulation # 4].

The neighborhood area surrounding the apartment buildings is a predominantly black, low-income, high-crime area. By 1989, the area surrounding the apartment buildings had deteriorated. By March of 1991, the owners of 13 buildings in a two-block area on East Mary Poppins Drive and West Mary Poppins Drive, including the Leas, had received condemnation notices.[8] [Joint Stipulation # 5].

On October 23, 1989, a fire was set in Apartment A of 1169 West Mary Poppins Drive.[9] Robert Lea notified Dick Guffey of the October 1989 fire for the purposes of asserting a claim against Republic. Dick Guffey, in turn, notified Republic, and Republic began adjusting the claim.[10] [Joint Stipulations # 6 and # 7].

Guffey was provided with documentation by Republic regarding the claim, including payments from Republic to the Leas totalling $14,720.35 made in early December of 1989. At the time of trial, Mr. Guffey had little, if any, memory when questioned with regard to the notice of claim to Republic involving the October 23, 1989 fire, or anything else for that matter.[11] The Court

5. *See,* Collateral Mortgage executed October 16, 1987 (Plaintiff's Exh. 110).

6. *See,* Collateral Assignment of Leases and Rents dated October 16, 1987 (Plaintiff's Exhibit 109).

7. *Compare,* Commercial Insurance Application dated 1/4/90 produced by Guffey on the Leas' behalf, wherein it represents that the amount of coverage under Republic's Dwelling/Fire Policy No. 3195584 was $75,000.00. The undisputed facts are to the effect that Republic's coverage was never as low as the figure quoted in the application, and Guffey was either aware or should have been aware of that on January 4, 1990. (Plaintiff's Exh. 1).

8. *See,* Document entitled "Buildings and Owners of Buildings in the Two–Block Area Receiving Condemnation Notices" (Court Exh. 1).

9. *See,* Harvey Volunteer Fire Department Incident Report of October 23, 1989 (Plaintiff's Exh. 26), wherein it is noted: "There was no [electricity] meter in apartment A.... Apt. A had no contents at all. It had been vacant for about 3 months. The windows and doors had been broken for about 1 month." *See also,* LP & L Records of Service Orders and Requests (Plaintiff's Exh. Nos. 78 and 79) and Plaintiff's Exh. 126 which reflects that there was no electric service at Apartment A from December 28th, 1988 to March 12th 1989 and further no service from March 15th thereafter and that the meter was removed on May 16th, 1989.

10. *See,* Republic's Claim File Regarding the 10/23/89 Fire, ACORD Property Loss Notice dated October 23, 1989 (Plaintiff's Exhibit 27) reported by "MIMI" to Republic. Guffey testified at trial that Mimi is the name of his secretary. Considering that the adjuster's log sheet reflects that he contacted Robert Lea on October 24th, 1989 and made an appointment with him for the next day, October 25th, 1989, this Court has every reason to believe that Guffey's secretary, Mimi, called in the Leas' 10/23/89 fire claim to Republic on the same day that Guffey was notified of the fire.

11. Guffey testified that he had been doing business as Dick Guffey Insurance for approximately five or six years—that is, since December of 1983. Prior to that time he was the President of the Carruth Agency and President of Dixie Insurance Agency for approximately three and four years, respectively. He also testified that he spent some time in the claims departments of General Accident, Commercial Union Insurance Company, and U.S.F. & G. He testified in summary that he has been in the insurance business for a total of 29 years. Despite his experience in the claims handling end of the insurance business, Guffey testified that he kept

here relies on the credible testimony of David Johnson, who was employed by Republic in its Baton Rouge office as a claims adjuster in October of 1989. In fact, Mr. Johnson adjusted the 10/23/89 fire claim for Republic. While inspecting the property right after the fire, it appeared to Johnson that Apartments A, B, and C of 1169 West Mary Poppins Drive were unoccupied, stating that there was no furniture in either apartment A or B, and that apartment C had only a small amount of furniture stacked up against the wall. He further testified that the copies of the checks made by Republic to the Leas for repair for fire damage as a result of the 10/23/89 fire were sent to the agent, Guffey. Johnson testified that he spoke to Guffey on several occasions during the adjustment of the claim: (1) first, he called Guffey to discuss some difficulties he was having dealing with the insured's the Leas; and (2) the second call was to notify Guffey that Robert Lea had a question regarding the adjustment of claims.[12]

On December 8, 1989, 14 of the 16 Mary Poppins Street apartments were vandalized.[13] Robert Lea testified that he recalled the incidents of vandalism occurred before the 1989 Christmas freeze. The police report generated in connection with the December 1989 vandalism incidents reflects that all of the apartments were vacant at this time. (Plaintiff's Exh. 28). Robert Lea testified upon questioning by Mr. Gremillion, that he reported the second incident [the vandalism] sometime between Christmas and New Years or right after the 1st of the year—that is, January 1, 1990. Later when questioned by counsel

for Independent Fire, Robert Lea testified he reported everything [i.e., property damage claims] to Guffey either the day it happened, the day he found out about it or the day after. Guffey apparently reported the claims pursuant to the December 1989 vandalism of the Mary Poppins properties to Republic.[14]

On December 24, 1989, a pipe burst in 1173 West Mary Poppins as a result of a hard freeze, causing water damage. Dick Guffey was again notified of the loss by the Leas so Guffey could notify Republic. Guffey notified Republic for the purposes of making a claim.[15] [Joint Stipulation # 8].

In December 1989, the Leas and Dick Guffey received notice from Republic dated December 11, 1989 that all four Republic policies were not going to be renewed on their expiration date of January 21, 1990. The reasons given by Republic for the non-renewal of the Republic policies are as follows: 1169 West Mary Poppins Drive—vacant; 1173 West Mary Poppins Drive—poor roof; 1168 East Mary Poppins Drive—physical conditions; and 1172 East Mary Poppins Drive—physical conditions. [Joint Stipulation # 9].

The testimony of Republic's claims adjuster, David Johnson, and the Republic's records corroborate that vacancy and poor physical conditions of the property were in fact the reason why Republic notified its insureds, the Leas, and their insurance agent, Mr. Guffey, of its intention not to renew coverage on the Mary Poppins properties. There was simply no competent evidence adduced at trial supporting the

---

no notes of his calls with the Leas or Republic and the only reports he kept in his files would have been the acknowledgment and receipt of claim and a copy of the claim.

**12.** *See also,* Republic Insurance Claim File—re: October 23, 1989 fire (Plaintiff's Exh. 27).

**13.** *See,* Republic's Claim Files—Re: vandalism at 1168 and 1172 East Mary Poppins and 1169 and 1173 West Mary Poppins (Plaintiff's Exh. Nos. 29, 30, 31 and 33). The date of loss reported *via* Republic's "Acknowledgment of Assignment" was December 8, 1989. Thereafter, the acknowledgment reads in pertinent part: "Please notify us if any of the above informa-

tion is incorrect." The record is devoid of evidence tending to suggest that the date of loss regarding the vandalism was any date other than December 8, 1989. Neither Guffey nor the Leas notified Republic that any of the information reflected in the acknowledgment was incorrect.

**14.** *Id.* ACORD Property Loss Notices dated 1/24/90 reported by Dick Guffey's secretary Mimi.

**15.** *See,* Republic Claim File—Re: December 1989 Freeze, ACORD Property Loss Notice dated December 26, 1989, reported by Guffey's secretary "Mimi" (Plaintiff's Exh. 33).

Leas' and Guffey's impressions that Republic was going to stop writing coverage in Louisiana [i.e., "running off" business]. The evidence was rather to the effect that Republic is continuing to do business in the State of Louisiana.

Upon receipt of the Republic notices of nonrenewal, Robert Lea contacted Dick Guffey for the purpose of obtaining insurance coverage, at the lowest possible premium, to replace the Republic policies which were being nonrenewed. Robert Lea did not instruct Dick Guffey to procure insurance coverage from any particular company. [Joint Stipulation # 10].

### 3. Application for Coverage to Independent Fire.

In accordance with Robert Lea's instructions to find insurance coverage, Dick Guffey prepared an application dated January 4, 1990 using a standard insurance industry form. Dick Guffey filled in the application and signed it in the place designated for "producer's signature." None of the Leas signed the application. [Joint Stipulation # 11].

Dick Guffey submitted the application to Independent Fire Insurance Company, where it was received on January 9, 1990 in Independent Fire's commercial underwriting department in Jacksonville, Florida by Yvonne Palmer, an underwriter. The application requested that Independent Fire issue a package commercial line fire and liability policy with a proposed effective date of January 21, 1990. The application sought coverage in the amount of $75,000.00 per building with a $250.00 deductible.[16] [Joint Stipulation # 12].

The application form utilized by Dick Guffey requested information that is used by underwriters in determining the acceptability of a proposed risk. The application seeks information on the occupancy of the apartment buildings, whether other policies covering the apartment buildings had been canceled or non-renewed, loss history of the apartment buildings, and information about prior insurance carriers that had cov-

ered the apartment buildings. [Joint Stipulation # 13].

Upon questioning by counsel for Independent Fire, Guffey agreed that in considering whether a risk is acceptable, unoccupied habitational property presents an extra-hazardous risk. He further admitted that accurate prior claims and coverage history is important information bearing on the acceptability of the risk of habitational property. Wayne Smith ("Smith"), market supervisor of Independent Fire, testified that he was familiar with his company's underwriting guidelines, and that it was his job to meet with agents/producers in order to familiarize them with same.

Smith testified that prior to January of 1990 he had met with Guffey on as many as a dozen occasions in this vein and Guffey was apprised of Independent Fire's requirement of "full disclosure"—that is, the underwriting department should be notified in an application for insurance coverage of everything there is to know about a risk. As to the risk of insuring habitational properties, a producer is expected to include in applications therefor, accurate information regarding the physical condition, occupancy/vacancy, and prior claims and coverage history.

The application for coverage of the Lea's Mary Poppins properties submitted to Independent Fire under the section entitled "Nature of Business/Description of Operations/Occupancy by Premises" merely states "4 plex apartments", with no further description of the occupancy or vacancy. Guffey did not personally inspect the interior of the apartments, but he did photograph the exterior of the apartments and forwarded the photographs to Independent Fire with the application. Guffey testified that it "appeared" to him that the apartments were occupied, and he relied on Robert and/or Ed Lea's representation that the apartments were occupied. [Joint Stipulation # 14].

In response to a specific question on the application regarding whether any policy or coverage had been declined, canceled or non-renewed during the prior three years,

16. See, Commercial Insurance Application dated January 4, 1990 [Plaintiff's Exh. 1].

the application stated "no", although Dick Guffey and the Leas knew that the Republic policies had been non-renewed. [Joint Stipulation # 15].

Under the section of the application entitled "Prior Carrier", the application stated that the amount of property coverage under the Republic policies was $75,000.00, although Dick Guffey was aware that the actual amount of coverage was $155,000.00 per building. [Joint Stipulation # 16].

### 4. *Negotiations with Independent Fire—No Policy Issued.*

Believing the information contained in the application to be truthful, Yvonne Palmer [17] prepared a written quote on January 9, 1990. In this written quote, Yvonne Palmer advised Dick Guffey that Independent Fire no longer wrote commercial line package policies, but Independent Fire could offer "mono-line" commercial fire and general liability policies. Yvonne Palmer ("Palmer") then quoted a premium under the standard fire and standard general liability program, utilizing a "special form", assuming a $250.00 deductible and property coverage of $75,000.00 for each building. [Joint Stipulation # 17]. Her written quotation letter of January 9, 1990 unequivocally states: *"XX If you would like to have the policy issued, please forward written confirmation."* [Plaintiff's Exh. "6"].[18]

On Thursday, January 18, 1990, Dick Guffey telephoned Yvonne Palmer and advised her that the quote was unacceptable because the premiums were too high. Guffey requested that Palmer requote coverage, assuming a $1,000.00 deductible per building and "basic", rather than "special" coverage. Later that day, Palmer telephoned Guffey and provided a quote in accordance with the modified parameters of proposed coverage. [Joint Stipulation # 18].

Palmer testified in deposition that upon being advised of the requote, Guffey did *not* request issuance of a policy, as he had to discuss the amount of premiums with his clients the Leas.[19] It is this Court's opinion that no policy issued and issuance was not requested based on the following: (1) Guffey never sent Palmer written confirmation; (2) Palmer never advised Guffey that she was going to issue a policy; (3) Neither Guffey nor the Leas were ever billed for or paid a premium to Independent Fire; (4) Neither the Leas nor Guffey ever received a policy or binder of coverage from Independent Fire; (5) Guffey, himself did not issue a binder with respect to coverage on the Lea's Mary Poppins properties; and (6) Guffey never took any action whatsoever to confirm the issuance of a policy prior to March 13, 1990, when a loss was reported to him. In fact, Guffey testified that he did not correspond with Palmer or anyone else at Independent Fire between the time of his second and last telephone conversation on January 18, 1990 with Palmer until March 13th, 1990, which was the same day he received a call from Robert Lea reporting another fire loss, and at which time he telephoned Palmer and requested that she issue a policy on the Mary Poppins properties and backdate coverage to January 21, 1990.

Palmer testified in deposition that no policy issued because Guffey never advised him that her requote based upon the modified parameters was acceptable and policies should be issued. Even assuming that on January 18, 1990 Guffey had requested that she issue a policy, Palmer testified that at that time she would not have known what type of coverage to issue.[20]

Guffey testified that on March 13, 1990 he telephoned Wayne Smith, Independent Fire's Marketing Supervisor, and informed Smith that a policy had not been issued,

---

17. At all pertinent times Yvonne Palmer was employed as an underwriter in the commercial underwriting department of Independent Fire in Jacksonville, Florida.

18. *See also,* Deposition of Yvonne Palmer taken on May 17th, 1991, pp. 17 and 21 [Plaintiff's Exh. 106].

19. *Id.* at pp. 21 and 23.

20. *Id.* at 23.

and there had been a fire loss.[21] Whereupon, Smith advised Guffey to contact Independent Fire's claims department and report the loss, which is standard operating procedure.

Guffey's stated impression that he had authority to bind coverage is belied by the fact Independent Fire's underwriting guidelines clearly indicate as to standard coverage [22], an agent such as Guffey has no binding authority whatsoever, and as to non-standard coverage [23], he would have no binding authority beyond $35,000.00.[24] In fact, Guffey did *not* issue a binder with respect to coverage of the Mary Poppins properties. The only reasonable inference from the aforementioned facts is that Guffey was aware that he had no binding authority with respect to the coverage requested *via* application on behalf of the Leas which was well in excess of $35,-000.00, and was rather indisputably $75,-000.00 per building to be exact.

5. *Investigation of the Leas' February/March 1990 Fire Damage Claims.*

Upon notification of the loss, Independent Fire's claim department undertook an investigation into the facts surrounding the

claims. As no policy had been issued, the property loss notices generated by Independent Fire simply reflected "commercial application" in the space where a policy number would ordinarily be assigned. [Joint Stipulation # 19].

It was standard operating procedure, that "red dots" were affixed to loss notices and claim files, as was done in the instant case pertaining to the Leas' March 1990 fire loss claims [Plaintiff's Exh. 56], to indicate that a policy had not issued. The uncontroverted trial testimony of Robert Powell was to that effect.[25] Robert Powell, Independent Fire's local adjuster assigned to investigate the Leas March 1990 fire loss, testified that the "red dot" indicates that there is a coverage problem. He further testified in cases such as this where there is no policy, the company identifies the claim with a "dummy" policy number, which is indicated by the "9999 designation." The coversheet of Independent's claims file reads in pertinent part as follows: "Entered Under 30–9999003 for processing Only Cvg Prob".[26]

Independent Fire's local claims adjuster, David Powell, inspected the properties and discovered that, according to fire depart-

**21.** *See also,* Correspondence of Dick Guffey to Wayne Smith, dated March 14, 1990 requesting that a policy be issued and back dated to January 21, 1990 (Plaintiff's Exh. 72).

**22.** As to the standard commercial program the underwriting guidelines states at paragraph 5: *"BINDERS—No binder may be issued by the Agent without specific authorization on each account from the Company.* [Plaintiff's Exh. 4 and emphasis as in original].

**23.** The underwriting instructions with regard to the non-standard commercial fire program read at Section L entitled "Binding Authority" as follows: "Do not Bind Risks above $35,000.00. Submit to Company for approval." [Plaintiff's Exh. 3].

**24.** This was the subject of both the trial testimony of Wayne Smith and the Deposition Testimony of Yvonne Palmer at pp. 28–33 (Plaintiff's Exh. 106). *See also,* Independent Fire' Underwriting Guideline's Easy Reference Card [Plaintiff's Exh. 2].

**25.** *See also,* Deposition Testimony of Yvonne Palmer, p. 41 [Plaintiff's Exh. 106].

**26.** *Id.* at pp. 53–54, 57–58. Palmer explained that the numbers 309999002 and 309999003 have no significance as a policy, but rather reflect the claim department assigning a number in order to enter information into its computer, and the designator "9999" was simply a claims work item number. As to the prefix "30", Ms. Palmer explained that it indicates a commercial and opposed to monoline package which is signified by the designator "15." Thereafter, Ms. Palmer explained the clerical error made by Independent Fire later non-renewing non-existent [i.e., "dummy"] policies. Palmer testified that in 1990 the company began non-renewing all of its commercial packages. That is reflected in Palmer's January 9th, 1990, quote to Dick Guffey. Independent Fire's computer system was programmed to automatically pick up all of the groups of numbers with the prefix "30", which included "dummy" policy numbers assigned to the Leas' claims, and to generate non-renewal notices. A "30" prefix was assigned to the Leas' claims because the application requested a commercial package policy, which would have carried a "30" prefix in the policy number, had a policy actually been issued.

ment records, multiple fires had been set on the following days in the following apartments:

1. February 22, 1990—1172 East Mary Poppins Drive, Apt. D;
2. March 6, 1990—1172 East Mary Poppins Drive, Apt. C;
3. March 7, 1990—1172 East Mary Poppins Drive, Apt. A;
4. March 15, 1990—1169 West Mary Poppins Drive, Apt. D.

There were at least eleven separate points of origin for the fires set in February and March of 1990 in the Leas' Mary Poppins properties. [Joint Stipulation # 20].

According to David Powell, who inspected the property on March 20, 1990, the Leas' Mary Poppins properties were in a deplorable condition.[27] In fact, the record is replete with evidence to the effect that the property was in a high crime area, most of the buildings were vacant and in fact boarded up, and the buildings themselves in a horrendous state and uninhabitable at least by people who valued their lives and were accustomed to necessities, such as plumbing and electricity. The testimony of Robert Lea and his brother, Edward Lea to the opposite effect flies in the face of the LP & L records of subject properties [Plaintiff's Exh. Nos. 78, 79 and 126]. On his March 20th, 1990, inspection of the properties, Powell was accompanied by two sheriff's deputies and Robert Lea. There is no question that the properties' physical condition and vacancy problems which go "hand-in-hand", worsened over a period of time. However, the Court here notes that as of January 1, 1990, there was obviously a severe problem with the habitability, physical condition, and occupancy of the Mary Poppins properties [i.e., the *raison d'etre* of Republic's decision to notice non-renewal of coverage on the Mary Poppins properties in early December 1989].

Robert Lea admitted that David Duke campaign signs were affixed on the outside of the second story of the Mary Poppins properties *with his permission*. Consider-

ing that this location was at all pertinent times a high-crime, low-income and predominantly black neighborhood, such action by a property owner is tantamount to arson by willful neglect. Aforesaid David Duke campaign signs were visible upon David Powell's March 20th, 1990 inspection of the properties.

On March 20, 1990, Yvonne Palmer telephoned Dick Guffey and advised him that Independent Fire would not issue any policies, and on March 21, 1990 confirmed the rejection of the application in writing. [Joint Stipulation # 21].

In April of 1990, Wayne Smith, marketing supervisor of Independent Fire, personally inspected the Mary Poppins properties. He first met with Guffey at his office and then Guffey accompanied Smith to the properties. Smith testified that in the area he saw homes boarded up within 2 blocks of the apartments. At the time of Smith's inspection, the Leas' Mary Poppins properties were totally vacant, the doors were wide open, there was evidence of vandalism in addition to the fire damage and there was drug paraphernalia strewn about.

On April 10th, 1990 following his inspection, Smith addressed a letter to Guffey terminating the contractual agreement[28] with Dick Guffey Insurance Agency. Smith testified that he was disappointed that someone producing business would propose a risk not even close to the underwriting guidelines. At this point in time, Smith was not yet made aware of the misrepresentations made in the application for coverage submitted on behalf of the Leas, to wit: (1) prior claims history with Republic; (2) occupancy/vacancy of Leas' Mary Poppins apartments; (3) prior coverage non-renewed by Republic; and (4) amount of prior coverage under Republic's policies.

Further investigation by Independent Fire Insurance Company revealed that, contrary to what was stated in the application, the Republic policies issued to the Leas had been non-renewed, and the amount of prop-

---

**27.** *See also,* Summary Report of 3–21–90 [Plaintiff's Exh. 57].

**28.** Independent Fire Insurance Co., Thomas Jefferson Insurance Co., Herald Insurance Company Agency Agreement [Plaintiff's Exh. 68].

erty coverage under the Republic policies stated in the application was incorrect, and the true amount of property coverage under the Republic policies was more than double the amount applied for. Independent Fire also discovered the claims history under the Republic policies, which was not even mentioned in the application. [Joint Stipulation # 22].

Guffey testified that at the time he prepared the application dated January 4, 1990, he had not been advised of a high turnover rate or the true nature of the vacancy problems which were visited upon the Mary Poppins property at the time. His testimony to this effect is corroborated by Robert Lea, who testified that he told Guffey that only one of his apartments were vacant. This Court is of the opinion that Guffey who had merely driven by the properties once, was not aware of the vacancy problems and was not so advised by Guffey.[29] However, Guffey was aware of the prior claims/coverage under Republic's policies and that fact the these policies were noticed as non-renewed at the time he applied for coverage to Independent Fire on behalf of the Leas.

After the current mortgagee for the apartment buildings, Secor Bank, was advised that there was no property coverage in effect for the apartments, Secor Bank force-placed property coverage on the apartment buildings through Meritplan. [Joint Stipulation # 23].

The Leas have made claims against Meritplan Insurance for damage occurring on or after March 30, 1990, and have instituted legal actions in federal court against Balboa/Meritplan. [Joint Stipulation # 24].

### 6. *Deterioration of the Leas' Mary Poppins properties.*

By 1989 the neighborhood, including the properties located at East and West Mary Poppins, deteriorated rapidly and became infested by vagrants, drug dealers and drug addicts. In late 1989 at times armed police escort was employed to enter the neighborhood. Also, in late 1989, property owners in the neighborhood began hiring off duty sheriff's deputies to patrol the area.[30]

By late February of 1990, all electrical service had been disconnected to three of the apartment buildings all of which were totally vacant. The fourth building had no more than two tenants.

### B. THE LEAS' CROSSCLAIM AGAINST DICK GUFFEY.

There is simply no way this Court can find that these two [i.e., Robert Lea and Dick Guffey] were not in "cahoots." At the trial of this matter both Robert Lea, who at all times purported to act on behalf of his co-owners, and Dick Guffey appeared to present a united front as against Independent Fire. Robert Lea testified that he apprised Guffey that only one of the apartments of the Mary Poppins properties was vacant. Dick Guffey testified that such was his recollection and his "drive-by" indicated the properties were occupied. Guffey and Robert Lea's corresponding lapses in memory suggest that both were working together at all times in search of coverage for habitational properties, which either both of them or for sure Robert Lea knew were virtually uninsurable—that is, if the risks were aptly described and the true nature of the risk fully disclosed to a prospective insurer in an application for insurance, coverage would certainly be declined.

As of December 1989, both were aware of the fact that Republic non-renewed coverage of the properties as of January 21, 1990, and Republic's reasons therefor [i.e. physical condition/vacancy]. Robert Lea who frequented the properties was well-aware of their deteriorating conditions and was apparently not surprised by Republic's decision not to renew coverage in December of 1989.

---

**29.** This finding should not be construed to mean that there was no vacancy problem in December of 1989, as the LP & L records tells quite a different story, but rather, simply as it states,

that Guffey was neither aware nor made aware of the true nature of the risk.

**30.** Lea/Meritplan, Stipulation of Fact # 8.

In this vein, Robert Lea's background figures prominently in this Court's factual findings bearing on the Leas' crossclaim against Guffey. Robert Lea admitted that at the time Guffey was to attempt to place coverage for the Mary Poppins properties, he [Robert Lea] was concerned about the difficulties attendant to obtaining such replacement coverages considering the history of Republic's non-renewal of coverages. He further testified that there were one or two unsuccessful attempts to obtain coverage for the Mary Poppins properties through one or two agents, other than Guffey, and eventually coverage was "force-placed" by Secor. Robert Lea further admitted that "force-placed" coverage is a coverage of last resort.

Essentially, the Leas failed to put on a case against Dick Guffey. The only testimony adduced tending to indicate any discontent with Guffey's actions on their behalf was Robert Lea's testimony that he was "flabbergasted" [i.e., bewildered, overcome with surprise]. This Court simply finds it hard to believe that Robert Lea would be surprised by the fact that any agent would encounter tremendous difficulty trying to procure coverage on the risk for which coverage was sought—that is, property coverage for habitational properties which were beset with occupancy/vacancy problems, high turnover, a significant prior claims history, and a history of non-renewed prior coverage and located in a high crime, low-income neighborhood which had deteriorated to such a state that a police escort was essential to view the property to survey and assess the ongoing damage to the properties.

Robert Lea admitted upon questioning that he was an attorney by profession but has not practiced since 1981. He further testified that since that time, he went into the rental property business and that he has another property on Chartres Street, in New Orleans, Louisiana. This Court can only conclude that Robert Lea, a businessman of some sophistication, could not have reasonably expected but that any insurance agent/broker, including his own agent/broker Dick Guffey, would encounter anything short of the "chinese wall" in an attempt to

procure coverage on the Mary Poppins properties effective January 21, 1990 upon full disclosure [i.e., utter candor] regarding the true nature of the risk to be insured.

These facts standing alone, preclude a finding in favor of the Leas and against Guffey on their claim against him as their agent and failing to procure coverage on their behalf.

## II. CONCLUSIONS OF LAW.

A. *No Policy—No Binder—No Premium—No Meeting of the Minds—No Coverage.*

Louisiana law controls this diversity action. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Viviano v. Travelers Insurance Company,* 533 F.Supp. 1, 6 (E.D.La.1981).

■ The plaintiff in this declaratory judgment action argues that there was no "meeting of the minds" necessary to the formation of a contract between the Leas and Independent Fire. Under Louisiana law, an application for insurance coverage merely constitutes a contractual offer, and the insurance contract is not completed until the application is accepted by the insurer. *McKenzie & Mouk, Inc. v. Hall,* 467 So.2d 1220, 1222–23 (La.App. 2nd Cir.1985) [citing, *Kieffer v. Southern United Life Ins. Co.,* 437 So.2d 919 (La.App. 2nd Cir. 1983), *cert. denied,* 442 So.2d 456 (La. 1983) ]; *Sanders v. Hartford Life Insurance Company,* 350 So.2d 945, 946–47 (La. App. 2nd Cir.), *cert. denied,* 351 So.2d 1208 (La.1977); *Upton v. Fidelity Standard Life Insurance Co.,* 185 So.2d 297 (La.App. 1st Cir.1966); *Monte–Janssen v. Continental Casualty Co.,* 203 F.2d 191, 194 (5th Cir.1953).

■ As in the case of contracts generally, it is a prerequisite to the creation of a contract of insurance that there be an offer or proposal by one party and an acceptance by the other. In other words, a contract requires an offer and an acceptance, and an application for insurance is not a contract of insurance but merely a proposal or offer by or on behalf of the applicant for the

purchase of insurance. The contract is not made until the application is accepted by the company and no contract is complete without the consent of both parties. La. Civ.Code Article 1927.

 While a contract of insurance ordinarily is effected by an offer of one seeking insurance and an acceptance by the insurance company, such is not always the case. For instance,

An offer or a counteroffer to insure may be made by an insurer to a proposed insured. Thus the company, instead of accepting an application for insurance, makes a counteroffer or proposition, this may be accepted or rejected by the applicant, or proposed insured at his pleasure. Until accepted, the proposal does not become a contract. *The acceptance of such a proposal must be shown by some act binding on the party accepting beyond a mere mental resolution to that effect.* The general rule is as stated in 44 C.J.S. Insurance § 232, p. 980:

'* * * where the proposal to insure comes from an insurance company, it must be accepted by the person to be insured, who must notify the company of his acceptance; and if his acceptance is sent by mail the risk begins when the letter of acceptance is mailed. *An acceptance after the fire occurs comes too late.'*

The rule is recognized in this State that generally contracts of insurance are conditioned upon the existence of the subject of insurance at the time of contracting.[31]

In the case at bar, there was no acceptance. It was only after the February/March 1990 fires occurred at the Mary Poppins properties that Guffey "attempted" acceptance of the January 18th, 1990 requote on behalf of the Leas. As previously stated, an acceptance after the fire comes too late.

Dick Guffey's submission of the January 4th, 1990, application to Independent Fire constitutes an offer, which was not accepted by it. Rather by written quotation letter of January 9, 1990, Yvonne Palmer responded with a new offer [i.e., a counteroffer][32] It is not disputed that Palmer's quotation proposed a different type of coverage than the "commercial line package" proposed *via* the application on behalf of the Leas.

On January 18, 1990, by telephone conversation initiated by Guffey, he advised Palmer that the January 9th, 1990 written premium quotation was unacceptable because the premiums were "too high." That constituted a rejection of Independent Fire's counteroffer. Guffey then requested a requote based on the modified parameters, to which Palmer responded later the same day with a requotation of coverage at a much lower premium. The evidence simply does not reflect that this counter-counteroffer [i.e., the January 18th, 1990 requotation] was ever accepted either by or on behalf of the Leas.

Yvonne Palmer's written quote of January 9, 1990, unequivocally indicated that a written confirmation was necessary. Moreover, her testimony was to the effect that in such circumstances written confirmation was customary. Guffey admitted that he did not tell Palmer on January 18, 1990 to issue a policy. His testimony was rather to the effect that it was his understanding that he had to check with his insureds but that Palmer would issue the policy if he did not get back in touch with her.

The Court here specifically concludes that Guffey's stated impression was unreasonable under the circumstances. The Court further finds that after being advised by Guffey that he had to confer with the Leas, it was reasonable for Palmer to expect some sort of response unequivocally indicating "acceptance" either orally or in writing from Guffey regarding the requotation of coverage and the modified param-

---

**31.** *Rigdon v. Marquette Casualty Company,* 163 So.2d 442, 448–449 (La.App. 2nd Cir.), *cert. denied,* 246 La. 578, 165 So.2d 480 (La.1964) [emphasis supplied].

**32.** La.Civ.Code Article 1943 states: "An acceptance not in accordance with the terms of the offer is deemed to be a counteroffer."

eters of coverage. In light of the written quotation letter of January 9th, 1990, specifically requesting written confirmation, and the underwriting guidelines provided Guffey by Independent Fire, Guffey's expectation that Independent Fire would assume that Guffey's clients accepted the requotation, without some notification from Guffey either by telephone or in writing that the Leas found the requotation acceptable, was unfounded. In any event, Independent Fire advised Guffey in *no uncertain terms,* on more than one occasion that written acceptance was the appropriate manner.

Louisiana Civil Code Article 1927, indicates that is no need for conformity between the manner in which the offer is made and the manner in which it is accepted, "unless it is otherwise specified in the offer." The Louisiana Civil Code further provides as Article 1936, as follows:

> A medium or a manner of acceptance is reasonable if it is the one used in making the offer or one customary in similar transactions at the time and place the offer is received, unless circumstances known to the offeree indicate otherwise.

In this case, not only did the January 9th, 1990 written quote [i.e. a *form letter* created and used by Independent Fire's commercial underwriting department to respond to applications], indicate that written confirmation was necessary, but Ms. Palmer testified that even if she had been advised by telephone that the quote was acceptable, written confirmation was necessary and no such written confirmation was ever sent to or received by Independent Fire.

■ Under the circumstances aforementioned, a purported "acceptance" by silence was not a reasonable manner of acceptance within the meaning of Article 1936. Moreover, acceptance must be shown by some act binding on the party accepting beyond a mere mental resolution to that effect.[33]

Again, Independent Fire was given no indication whatsoever, that the Leas consented to any of variations in the original premiums or the original coverage requested. Yvonne Palmer testified that at the time she would not have known what type of coverage to issue.[34]

■ The facts are clearly that Independent Fire never issued any policies of insurance to the Leas for the properties at issue, Independent Fire was not paid and did not receive a premium, and both Robert Lea and Dick Guffey were well-aware of those facts before any claims of loss were submitted by the Leas. Independent Fire never billed Dick Guffey or the Leas for a premium. That through clerical error, Independent's Fire computer system automatically picked up the "dummy" policy numbers contrived to identify the Leas February/March 1990 fire damage claims, and generated non-renewal notices with respect to "policies" which never in fact existed creates no coverage by estoppel.

It is well-settled that estoppel cannot be used to create coverage beyond that set forth in an insurance policy.[35] There was no "meeting of the minds" and accordingly, no insurance contract. A clerical mistake, that is the issuance non-renewal of notices with respect to non-existent policies, can have no effect whatsoever.

■ After hearing all of the evidence in this case, this Court is convinced that Guffey was not an agent capable of binding Independent Fire for the property owners' coverage requested for the same reasons stated in this Court's earlier reported decision in this matter, *Independent Fire Insurance Company v. Lea,* 775 F.Supp. 921 (E.D.La.1991).

Guffey was certainly not acting as an agent for Independent Fire upon requesting a premium payment from the Leas in the amount of $850.00 made out to himself and deposited to his own account. Said amount bore no relation to premium

---

**33.** *McKenzie & Mouk, Inc. v. Hall,* 467 So.2d 1220 (La.App. 2nd Cir.1985).

**34.** *See, supra* note 20 and accompanying text.

**35.** *Smith v. Republic National Life Insurance Co.,* 335 So.2d 739 (La.App. 2nd Cir.), *cert. denied,* 338 So.2d 706 (La.1976).

amount reflected in Palmer's requotation of January 18th, 1990 [i.e. $3133 original quotation less $500 as per the requotation of January 18, 1990].[36] Guffey testified that his records reflected the $850.00 as a credit for Robert Lea until it was used against the Lea's liability coverage procured from First Financial O.L.T. *with Robert Lea's permission.* Robert Lea was aware of the fact that he had paid no premium to Independent Fire as he authorized payment of the $850.00 to First Financial O.L.T. for liability coverage.

The evidence reflects that Guffey wholly ignored Independent Fire's underwriting guidelines, in an attempt to procure coverage for his clients the Leas on vacant habitational property beset with problems, which properties at the outset proved to be "risky business."[37] At the instant that Independent Fire became aware of the true nature of the risk proposed by Guffey, and the misrepresentations made by him with regard to the risk in the January 4, 1990 application for coverage, Independent Fire terminated its "agency agreement" with Guffey.

■ Whether an agency relationship exists is a factual determination to be made in consideration of the totality of the circumstances. Statutory definitions of agent or broker are not determinative of whether an intermediary is deemed to be an agent of the insurer for the purposes of a particular transaction.[38]

For the purposes of placing insurance coverage for the Leas, Guffey was acting as a broker, or as an agent for the Leas. Guffey was licensed by a number of companies. Indeed, Guffey procured prior coverage on the Mary Poppins properties from Republic Insurance Company for the Leas.

Guffey had no binding authority with respect to the risk applied for on behalf of the Leas. Having been asked by his client Robert Lea to procure coverage wherever he could get it at the best price, that is exactly what Guffey did—that is, Robert Leas' bidding. Guffey was not required by Independent Fire to refrain from soliciting insurance from other companies. For the purposes of the subject transaction, Guffey was a broker working acting on behalf of the Leas, and not as an agent of Independent Fire.[39]

Borrowing language from the decision in *Britten v. Payne,* 381 So.2d 855 (La.App. 1st Cir.), *cert. denied,* 384 So.2d 800 (La. 1980), this Court is of the opinion that the factual setting in the instant case shows:

> [Guffey] was not [Independent Fire's] agent for the purposes of binding [Independent Fire] for the premium price quoted by [Guffey]. Of particular importance is the fact that [Guffey] could only quote premiums and premium schedules but could not bind [Independent Fire] prior to [Independent Fire's] approval of a policy. Additionally, [Guffey] was not bound to place all its insurance with [Independent Fire], but could place coverage with any company with which it was licensed to do business. *Id.* at 858.

The facts in the case at bar show that Guffey, at the time he submitted an application on behalf of the Leas, and negotiated thereafter until abandoning said negotiations on January 18th, 1990, was a broker acting on behalf of the Leas, and not as an agent of Independent Fire.

For that reason, any wrong acts or omissions of Guffey in preparing the Lea's application for insurance are not imputable to

---

**36.** Here it is important to note that the invoice dated January 16, 1990 generated by Guffey and sent to both Robert Lea and the mortgagee Secor reflected the premium amount of $3133.00, not the requotation in an amount $500 less than aforestated premium. (Lea's Exh. 18). Guffey testified that he never generated an invoice which corresponds to the January 18th, 1990 requotation. In other words, Guffey had a quote for $500 less as of January 18, 1990, but he never revised his billing.

**37.** Robert Lea's testimony was that he never had a positive cash flow on the Mary Poppins properties.

**38.** *Motors Insurance Co. v. Bud's Boat Rental, Inc.,* 917 F.2d 199, 204 (5th Cir.1990).

**39.** *See, Independent Fire Insurance Company v. Lea,* 775 F.Supp. 921 (E.D.La.1991) and cases cited therein.

Independent Fire, nor is any commitment made by him to the Leas binding upon it.[40]

██ Even if this Court were to conclude that Guffey had not abandoned the insurance negotiations between himself and Independent Fire's underwriter Palmer as of January 18, 1990 until March 13, 1990, and were to construe this period of silence as an acceptance under the circumstances, Independent Fire would be entitled to void the policy for willful concealment or misrepresentation of material facts concerning the subject of the risk, including but not limited to omission of prior claims history with Republic, misrepresenting the amount of coverage under Republic's prior policies, and omission with regard to the fact that Republic's prior policies were non-renewed.[41] However, this Court's previous holding herein, that there is no policy and no coverage, obviates the alternative issue as to whether the policy is void for material misrepresentations in the application for insurance.

As the Court finds no coverage, the counterclaims of the Leas seeking penalties and attorneys fees are dismissed.

B. *Recovery of Damages by Independent Fire from Dick Guffey and the Leas on Account of Fraud.*

██ Independent Fire has asserted a claim against both Dick Guffey and the Leas for damages it sustained on account of fraud under Louisiana Civil Code Article 1958, which speaks to damages for fraud on account of recision, to wit: "The party against whom recision is granted because of fraud is liable for damages and attorney's fees."

Since there was no recision of the policy on account of fraud, rather this Court found there was no policy, there being no "meeting of the minds," Article 1958 is inapplicable to this case.[42] However, this

Court is of the opinion that Independent Fire is entitled to certain of its attorneys fees and expenses as damages/sanctions pursuant to F.R.C.P. Rule 11 against the Leas based on the egregious conduct of Robert Lea, to wit: (1) ratifying the actions of Guffey [knowingly setting forth material misrepresentations in the 1/4/90 application for insurance submitted to Independent Fire]; (2) adding insult to injury by amending his counterclaim to seek penalties and attorneys fees against Independent Fire at a time when he was well-aware of Guffey's misrepresentations contained in the application submitted to Independent Fire on their behalf; and (3) filing supplemental proofs of loss quadrupling the amount of the meritless claims against Independent Fire and thereby needlessly increasing the costs/expenses associated with investigating claims, trial preparation and the proceedings which ensued.

In *Thomas v. Capital Security Services, Inc.,* 836 F.2d 866 (5th Cir.1988) (*en banc*), enunciated the appropriate procedures and standards for the imposition of sanctions under Rule 11. The *Thomas* guidelines were summarized in the more recent panel opinion in *Foval v. First National Bank of Commerce in New Orleans,* 841 F.2d 126, 130 (5th Cir.1988):

First, we will review Rule 11 issues under an abuse of discretion standard. Second, Rule 11 imposes certain obligations on litigants and their counsel. Third, a district court must impose sanctions once it finds a Rule 11 violation. The court retains broad discretion in determining the "appropriate" sanctions, however, any reimbursed expenses must be found to have been caused by the Rule 11 violation and must be "reasonable." Fourth, a party seeking sanctions must promptly notify the court and the offending party of its belief that a Rule

**40.** *Motors Insurance Co.,* 917 F.2d at 204; *Duhon v. Mid–America Casualty Company,* 553 So.2d 1100, 1103 (La.App. 3rd Cir.1989); *United Credit Plan of Jena, Inc. v. Hailey,* 341 So.2d 58 (La.App. 3rd Cir.1976).

**41.** *Manzella v. Paul Revere Life Insurance Co.,* 872 So.2d 96, 98 (5th Cir.1989); *Viviano v. Trav-*

*elers Insurance Co.,* 533 F.Supp. 1, 6 (E.D.La. 1981).

**42.** The "Agency Agreement" between Independent Fire and Dick Guffey was terminated by Independent Fire and was not the subject of suit for recision herein.

11 violation exists. Fifth, a district court need not support its Rule 11 decision with specific findings of fact and conclusions of law in all cases. *Id.* at 130.

Rule 11 provides that the signature of an attorney on pleadings, motions, and other papers:

> constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Since as the *Foval* court noted, the specific act for which a party is sanctioned can affect the propriety of the sanction, and so that the reasons for which this Court here imposes sanctions is readily discernible the specific findings of fact and conclusions of law relative to this Court's determination that sanctions are appropriate follow.

The evidence in the present case shows that the Leas did not make the requisite reasonable inquiry into the facts and law underlying this case. Not only did Robert Lea never repudiate Guffey's actions, he expressly endorsed his actions as aforestated. Robert Lea testified at trial that his March 25th, 1991 deposition was the first time he learned of the misrepresentations made by Guffey in the application submitted to Independent Fire. However, Independent Fire's complaint declaratory judgment was filed as early as October 1990, and refers to the aforementioned misrepresentations with specificity and detail. Even after his deposition, wherein he unquestionably learned of the material misrepresentations in the application for insurance submitted to Independent Fire on his behalf, not only did Robert Lea persist in the wholly groundless counterclaim, but submitted additional proofs of loss [Plaintiff's Exh. Nos. 86, 87 and 88] to Independent Fire and served Independent Fire with an Amended Counter–Claim seeking penalties and attorney's fees.

Robert Lea was fully apprised of the "careless" if not reckless misrepresentations made by Guffey which were admittedly were misrepresentations and material to the risk. Robert Lea was fully aware that Independent Fire had never been paid a premium. It was Robert Lea who authorized diverting the payment of the $850.00, which purportedly procured coverage on the Mary Poppins properties as of 1/21/90, to pay First Financial O.L.T. for liability coverage. Having been fully apprised of all of the actions of Guffey and knowing that there was no policy and no binder issued either by Guffey or Independent Fire, no premium ever tendered to Independent Fire, the Leas had no colorable claim against Independent Fire for coverage.[43]

Instead of reevaluating his claims against Independent Fire in light of the undisputed facts, Robert Lea added fuel to the fire [i.e., submitted additional proofs of loss and amended his counter-claim seeking penalties and attorney's fees against Independent Fire].

Robert Walton, Assistant Vice President and General Counsel for Independent Fire testified that the supplemental proofs of loss submitted *via* coverletter dated April 9, 1991, "almost exactly quadrupled the amount of loss. The total amount being claimed in August of 1990 was approximately $50,000. Now, we are over $200,-000." In response to the question, "what happened to Independent Fire's expenses after March 25, 1991", Mr. Walton responded: "Thereafter we had a dramatic increase in our expenses and a need for more services and legal counsel. And thereafter, between March 25, 1991 and to the end of this year [i.e. 1991] we have incurred an additional $33,122.08."

In support of and in conjunction with Walton's testimony with regard to the expenses incurred after March 25th, 1991,

---

43. Dick Guffey's Post–Trial Memorandum, at p. 2 wherein it is candidly stated that: "It is inescapable that no policy was issued and that because there [w]as never any consent between Guffey and Palmer to enter such a contract...."

Independent Fire introduced into evidence plaintiff's exhibits 122, 124 *in globo,* and 125. Plaintiff's Exhibit No. 122 is a statement of legal expenses from Independent Fire's counsel Hailey, McNamara dated January 4, 1992, reflecting fees and expenses incurred from October 14, 1991 until December 31, 1991. Plaintiff's Exhibit 125 is a summary listed by check number and the date of issuance that reflects the checks and drafts which appear in Plaintiff's Exhibit No. 124, a business record generated by Independent Fire to keep track of expenses for each claim.

In summary, the documents aforementioned support Walton's testimony, that Independent Fire incurred additional expenses and attorney's fees relative to the Leas' claims in the amount of $33,122.08 between March 25th, 1991 until the end of that year. Robert Walton further attested *via* affidavit [Plaintiff's Exhibit 130] that the total travel expenses incurred by himself and Wayne Smith in connection with their court appearances at the January, 1992 trial and paid by Independent Fire amounted to $1,521.69. Finally the fees and costs billed to Independent Fire by its counsel Hailey, McNamara from January 2, 1992 through January 22nd, 1992 in connection with this matter is reflected in Plaintiff's Exhibit Nos. 129 and 129a and total $15,753.13. These expenses and attorneys fees incurred post–March 25th, 1991 [i.e., $33,122.08 + $1,521.69 + 15,753.13] total in the amount of $50,396.89.

Considering the undisputed facts known to Robert Lea as of his March 25th, 1991 deposition, his claim pursuant to L.R.S. 22:658 for arbitrary and capricious refusal to tender the undisputed amounts owing under a non-existent policy is specious, at

best and by any measure. In addition to that, the Leas submitted supplemental proofs of loss [Plaintiff's Exh. Nos. 86, 87, 88] which quadrupled the amount of the loss claimed against Independent Fire[44]— that is, after Robert Lea's deposition wherein the character of Dick Guffey's actions were made *infinitely* clear to him, Robert Lea made even more outlandish claims].

Independent Fire was required to expend considerable time, human resources, and money, investigating specious supplemental claims of some consequence in terms of dollars. It was further required to defend against an uproariously offensive and meritless claim for penalties and attorneys fees, considering the undisputed facts [i.e. the Joint Stipulations of the parties in this case].

The testimony of Robert Walton shows that the frivolous allegations asserted against Independent Fire *via* the Leas' amended counterclaim and the equally frivolous supplemental loss claims against it, required Independent Fire to expend considerable time and resources in opposing same.[45] Sanctions are indicated here for unnecessarily increasing the expense of this litigation and this Court is of the opinion that the appropriate sanction is that the Leas shall pay and Independent Fire shall recover its attorneys fees and expenses incurred from the time of March 25th, 1991 up to and including the time that post-trial briefs were submitted in this matter.

The Leas suggest in post-trial memorandum submitted to this Court that Independent Fire's claim for fees and costs is in reality "a grudge match between Independent Fire and Dick Guffey, with the Leas

---

**44.** Robert Walton, associate general counsel for Independent Fire, testified at length, how the actions of the Robert Lea in the face of the undisputed fact that there glaring material misrepresentations representations in the 1/4/90 application, unnecessarily increased the costs of litigation and claims handling.

**45.** The Court notes that a substantial portion of this trial focussed upon matters which were aimed at proving that there was no meeting of

the minds, and it was apparently conceded that the misrepresentations in the January 4, 1990 application were material and went to the heart of the risk and that coverage was therefore voidable. The remainder focussed upon damages to the Mary Poppins properties, more particularly when the damages were inflicted on the properties and the dollar figure ascribed to each succinct incident of whether it be fire or vandalism.

caught in the middle."[46] This Court disagrees. Robert Walton's testimony was clearly to the opposite effect—that while Guffey was the originator and signatory with regard to the material misrepresentations made *via* the 1/4/90 application, it was rather the actions of Robert Lea filing supplemental proofs of loss and a counterclaim for penalties and attorney's fees which needlessly caused Independent Fire's litigation, investigation and other expenses to skyrocket at a time when it was apparent to all the parties that there could be no coverage under the undisputed facts.

To the question on cross-examination, "Mr. Walton, is it your belief that it was the actions of the agent, Dick Guffey, that has caused Independent Fire to suffer these expenses that you have testified about", Walton responded: "No." When further asked to expand and state the specific reason for believing Robert Lea caused Independent Fire to incur needless expenditures both in terms of financial and human resources, Walton responded:

I will be pleased to be very specific, Counsel. March 25 of 1991, I attended the Deposition of Mr. [Robert] Lea. At that time Mr. Lea was examined by the applications for our [Independent Fire] coverage and the coverage that he had previously had with Republic Insurance Company. It has been his testimony, and I have been in this Courtroom and I have heard him testify, that in his opinion those applications were misrepresentations or misstatements.

Immediately following his opportunity to review those applications on March 25th, 1991, in his Deposition, we were handed $250,000 worth of additional claims that he was making notwithstanding his review and his opinion.

In addition to that, the next day, March 26th, 1991, an action was filed in this Court alleging not only that you [the Leas] were entitled to $250,000 in additional damages but that Independent Fire Insurance Company was arbitrary and capricious in not paying that. That occurred the day after that opportunity to review those applications, which he has testified were not correct and were misstatements. And he is the Lawyer, and notwithstanding that, we had to go forward after March 25th of 1991, to defend against not only a claim that now was a quarter of a million dollars—previously it had been 50—but that was arbitrary and capricious in not paying it.

The expenses and fees incurred by Independent Fire post-dating March 25th, 1991 which total $50,396.89[47] are here reiterated as follows:

(1) Expenses and attorneys fees from March 25, 1991 through the end of that year of $33,122.08, as per the trial testimony of Robert Walton and as reflected in Plaintiff's Exhibit 125.

(2) Travel expenses incurred in connection with court appearances at trial in the amount of $1,521.69 as reflected in Plaintiff's Exhibit 130.

(3) Expenses and attorneys fees from January 2, 1992 through January 22, 1992 total $15,753.13, as per Plaintiff's Exhibit 129 and 129a.

There is no question but that the attorneys fees [i.e., hourly rates of $80—partner, $75—associate, and $45.00 paralegal] are considered more than reasonable[48] and these made expenses necessary by and are directly proportional to the harassment and aggravation experienced by Independent Fire upon the Leas compounding their problem and attempting to confound the

---

**46.** *See,* Post-trial Memorandum on behalf of the Leas, at p. 5.

**47.** This sum in no way reflects any amount other than actual cash money expended by Independent Fire after March 25, 1991. In other words, the aforementioned sum does not begin to compensate Independent Fire for any expenditure of its own time or its resources made

necessary by the additional claims of the Leas and is therefore considered by this Court to be an extremely conservative estimate of cost to Independent Fire on account the Leas' additional claims.

**48.** See, Trial Testimony of Robert Walton.

obvious [i.e., the inescapable conclusion of no coverage].[49] Independent Fire should not have to bear the cost of defending against the Leas specious and frivolous amended counterclaim.

The Leas were given ample opportunity at trial to traverse the documents submitted in support of Independent Fire's claim for damages against them. Moreover, with respect to the documents submitted post-trial detailing expenses and fees incurred as of January 2, 1992 through January 22, 1992 [Plaintiff's Exh. Nos. 129 and 129a], this Court indicated at trial that the case would be held open to give the defendants the opportunity to traverse same. The Leas filed no motion to traverse. Accordingly and for all of the aforestated reasons,

IT IS ORDERED that there be judgement in favor of plaintiff Independent Fire Insurance Company and against defendants, Robert W. Lea, Jr., Randall Lea, Elizabeth Lemoine Lea, and Richard Dennis Guffey d/b/a Dick Guffey Insurance declaring that there is no coverage of the incidents which were the subject of this suit.

IT IS FURTHER ORDERED that there be judgment in favor of cross-defendant Richard Dennis Guffey d/b/a Dick Guffey Insurance and against cross-plaintiffs, Robert W. Lea, Jr., Randall Lea and Elizabeth Lemoine Lea, dismissing their cross-claim with prejudice.

IT IS FURTHER ORDERED that there be judgment in favor of cross-defendant Independent Fire Insurance Company and against cross-plaintiffs, Robert W. Lea, Jr., Randall Lea and Elizabeth Lemoine Lea dismissing their counterclaim with prejudice.

IT IS FURTHER ORDERED that there be judgment in favor of plaintiff Independent Fire Insurance Company, and against defendants, Robert W. Lea, Jr., Randall Lea and Elizabeth Lemoine Lea, for sanctions pursuant to F.R.C.P. Rule 11, in the full amount of $50,396.89, with interest to run from date of judgment until paid.

■ IT IS FURTHER ORDERED that there be judgment in favor of defendants, Richard Dennis Guffey d/b/a Dick Guffey Insurance, Robert W. Lea, Jr., Randall Lea and Elizabeth Lemoine Lea and against Independent Fire Insurance Company dismissing its claim pursuant to Louisiana Civil Code Article 1958, with prejudice, inasmuch as the basis of such action was the subject of an award of sanctions in its favor and against the Leas pursuant to Rule 11 [50] as aforestated.

The Clerk of Court is directed to enter a judgment in accordance herewith in the matter numbered CA–90–4293"A", the defendants, Robert W. Lea, Jr., Randall Lea, Elizabeth Lemoine Lea, and Richard Den-

---

**49.** In this vein, Robert Walton testified as follows:

This case and this claim from its inception and the issues surrounding the existence or non-existence of a policy and the actions of the agent tied up virtually every department of Independent Fire Insurance Company since March of 1990. That was all the way from Yvonne Palmer, who is in another rep department to Wayne Smith, who is in the marketing department, to our people who are in the computer department responsible for the handling of funds, to the legal department, our CEO and our executive staff. It ties up everybody in this case. Countless hours were wasted on something we shouldn't have been drawn into to begin with. It is incalculable not to mention the time that I personally had to spend to come to Metairie for Depositions, to come to attend the Trial, which was time that could have been spent on other

pressing legal matters that Independent Fire Insurance Company was involved in.

　*　*　*　*　*　*

These figures [i.e. dollar amounts expended by Independent Fire attested to by Walton] don't even come close to measuring the expenditure of the human resources, the people's time at the home office in Jacksonville as well as our local adjuster, Mr. Powell.

**50.** The Court here makes specific mention of the fact that the Independent Fires filing of its Supplemental and Amending Complaint stating a claim for damages for the actions of Robert Lea which needlessly increased the expenses of litigation is more than sufficient notice for the imposition of Rule 11 sanctions since the identical actions of the Leas supporting Independent Fire's claim for damages pursuant to La.Civ. Code Article 1958, form the basis of the Court's award of sanctions in this case.

nis Guffey d/b/a Dick Guffey Insurance to bear all costs of these proceedings.